Della J. BROWNING and Jay
Eledge, Plaintiffs,

v.

ROHM & HAAS TENNESSEE,
INC., Defendant.

No. 3:96–CV–1010.

United States District Court,
E.D. Tennessee.

Aug. 6, 1998.

Bill W. Petty, O'Connor, Petty, Child & Boswell, Knoxville, TN, Carol S. Nickle, Carol Nickle & Associates, Knoxville, TN and Thomas W. Osborne, AARP Foundation Litigation, Washington, DC, for Plaintiffs.

Edwin H. Rayson, Jr. and John B. Rayson, Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, TN, for Defendant.

### MEMORANDUM OPINION

JORDAN, District Judge.

This civil action is before the court on the motion of the defendant Rohm and Haas Tennessee, Inc. for summary judgment [doc. 15]. The plaintiffs have responded [doc. 23] and each party has filed extensive reply briefs [doc. 45 and 37]. Oral argument on the defendant's motion was heard on April 30, 1998; thus, the motion is ripe for the court's consideration. For the reasons stated below, the court finds the defendant's motion well-taken, and it will be granted.

In their complaint, the plaintiffs allege that the defendant violated both the Age Discrimination in Employment Act (29 U.S.C. § 621 *et seq.*) (ADEA) and the Tennessee Human Rights Act (Tenn.Code Ann. § 4–21–101 *et seq.*) by failing to hire them when they applied for positions in 1996, fourteen years after they had been laid off by the defendant during a reduction in force. The plaintiffs claim that the defendant adopted a new hiring policy which had the effect of making younger employees eligible for vacant job positions instead of the plaintiffs who were more qualified by virtue of their former employment with the defendant. The plaintiffs contend that the defendant has engaged in a pattern and practice of discrimination against older employees. The plaintiffs seek compensatory and punitive damages as well as an injunction directing the defendant to hire the plaintiffs for the positions for which they applied.

The defendant denies that age was a factor in its decision not to hire the plaintiffs. The defendant says that the plaintiffs were not hired because they had no legal or contractual right to be hired and they did not meet the hiring criteria adopted by the company. The defendant says that the hiring criteria have a manifest relationship to the duties of the jobs the plaintiffs applied for and the criteria serve the legitimate goals of the company.

### STATEMENT OF FACTS

The facts in this case are largely undisputed, but any disputed facts will be noted in the following recitation. The defendant, Rohm and Haas Tennessee, Inc., is a Delaware corporation with a plant in Knoxville, Tennessee, that manufactures emulsions and low molecular weight polymers. For many years, the Knoxville plant had two separate operations, the Plexiglas operation and the chemical operation. There were five separate departments in the Plexiglas operation (mold filling, special products, mold assembly, shipping, and finishing). The Plexiglas operation was highly mechanized with little or no computerization. *See* Affidavit of Ray Clift, attached to doc. 16. Most of the work involved manual or hands-on operations, including placing "spacer" on glass molds by hand; inserting "mold clamps" into a clamp applicator machine by hand; filling completed molds by hand; lifting Plexiglas sheets from conveyer lines and placing them on frames for transport; operating large table saws; constructing shipping boxes; and filling and packaging boxes by hand. The training period for new workers in the Plexiglas operation was anywhere from one to thirty days.

The second operation, and the only division still in existence at the Knoxville plant, is the chemical operation which manufactures emulsions and low molecular weight polymers used in paints, textiles, water treatment, and detergents. The chemical operation was always completely separate from the Plexiglas operation and more complex, and the training period for chemical operation workers was longer. When the chemical operation was computerized in 1987, it became even more complex than it had been in the past.

The plaintiff, Della Browning, began working for Rohm and Haas in the Knoxville Plexiglas operation in June 1976. She was an hourly employee who worked unskilled jobs, primarily in the mold filling depart-

ment.[1] She worked there until March 1982 when she was laid off, along with 108 other employees, due to a reduction in force.

The plaintiff, Jay Eledge, began working for Rohm and Haas in the Knoxville Plexiglas operation in November 1969. Eledge was also an hourly employee but he worked semiskilled jobs, primarily in the mold filling department.[2] Eledge also was laid off in March 1982. Neither of the plaintiffs worked in the chemical operation during the time they were employed by Rohm and Haas. At the time of their lay-off, both plaintiffs had the option of applying for other jobs at the Knoxville plant or at other Rohm and Haas plants, but neither pursued this option. In order to pursue this second option, the plaintiffs say they would have had to resign and lose their recall rights.

Under their collective bargaining agreement, Browning and Eledge had recall rights for three years after their lay-off. They were not recalled during this time, and Rohm and Haas notified them that their recall rights had expired. Under new collective bargaining agreements, the 1982 laid-off employees, including Browning and Eledge, had preferential rehiring rights for two successive two year terms, or until March 1989.[3] Neither of the plaintiffs, nor any other laid-off employees, were recalled during this time period.

In December 1987, Rohm and Haas permanently closed the Plexiglas operation, and the plaintiffs' positions were abolished. Senior Plexiglas operation employees were transferred in groups of ten to the chemical operation and trained as chemical operators.

Less senior chemical operators were transferred to the Plexiglas operation and ultimately laid off in December 1987. A total of sixty-nine employees with less seniority were laid off with the same three-year recall rights and two successive preferential rehiring rights agreements as those employees who were laid off in 1982. Some of the 1987 laid off employees were recalled or rehired, some resigned and went to another Rohm and Haas plant, some refused recall or rehire, and some retired.

From March 1979 to February 1993, Rohm and Haas hired no new employees at the Knoxville plant. In the early 1990's, Rohm and Haas became concerned that senior employees who would be retiring in the near future would leave significant vacancies in the chemical operation. Rohm and Haas decided to begin to hire and train new employees in anticipation of these vacancies. In his affidavit, Ray Clift, says the company believed that the chemical operation had become so complex, partially because of the decision to computerize the operation and partially because of the nature of the operation itself, that the hiring criteria for these newly hired employees needed to be expanded. A hiring committee studied the problem and determined that the new employees should have computer skills, a strong background in organic chemistry and mathematics, consciousness of environmental and safety concerns, and the ability to read and write above a twelfth grade level. Clift says in his affidavit that: "With these skills as a prerequisite, the Company could concentrate on production unit specific training and thereby

1. In her deposition, Browning described her job as follows: "I didn't work on the chemical side, but I worked in mold filling, which was worse chemicals, and I had to do all of the cleanups and dispose of the chemical waste.... I was around chemicals the whole time I was in mold filling." Her personnel record shows that she worked as an office janitor, a material handler, equipment cleaner, a finishing cleaning operator, and a clamp applicator operator—all unskilled positions.

2. In his deposition, Eledge described his job as follows: "Well, when I worked down there [the Plexiglas operation], I was in several departments. I worked in the stock cutting department, the shipping department, PD department,

in the lab. They had some temporary jobs in shipping/receiving or receiving and part-time or temporary jobs in the yard ...." His personnel file shows that he worked as a saw helper, a mold maker, Plexiglas processor, office and laboratory janitor, polisher helper, mirror operator, polisher, mat handler, miscellaneous relief finisher, sheet recovery operator, assistant polymerization operator, mold line starter, and masker.

3. According to the affidavit of Charles A. Clark, recall rights and preferential rehiring rights are different because employees with recall rights retain a portion of their benefits seniority for the period they are laid off, while those employees with preferential rehiring rights do not. *See* Affidavit of Charles A. Clark, attached to doc. 16.

have a fully qualified chemical operator in an acceptable time frame who possessed the knowledge of math and chemistry necessary to trouble-shoot the process." Based on these requirements, the hiring committee recommended that Rohm and Haas adopt the following hiring policy:

Due to the complex demands of operating a chemical plant in an increasingly competitive environment, we have established the following requirements for those applicants seeking hourly production jobs.

An Associate Degree in Chemical and Environmental Engineering Technology from Pellissippi State (or equivalent degree from another school), *or*

Five years of relevant experience in chemical plant operations *or*

A relevant four year degree from an accredited college or university.

This policy will go into effect when the current list of former employees with rehire eligibility is exhausted.

It is Clift's opinion that the hiring criteria are job related; that is, there is a strong correlation between the criteria and the job duties of a chemical operator. Clift believes that the use of these hiring criteria should substantially increase the efficiency and productivity of the chemical operations and reduce training costs. Clift denies that the hiring committee considered pension eligibility, age, race, or gender in recommending the hiring criteria.

This view is supported by the affidavit of Kenneth Chapman. Chapman is employed by the American Chemical Society (ACS) as head of Technician Resources/Education. In about 1993, the United States Department of Education awarded the ACS a grant to study chemical technician skills nationwide. Chapman managed the project which involved a comprehensive study of the skills required for Chemical Process Technicians (chemical operators). According to Chapman, the study concluded:

To meet the demands of government regulations and automation during the 1990's, Chemical Operators have experienced a particularly rapid increase in the requirements of computer, communications, scientific, and technical knowledge and skills that must be reflected in increased knowledge and skills that new workers must bring to the workplace.... [T]he chemical process industry faces a particularly critical need for entry level operators who have much better knowledge and skills than their predecessors, particularly in the areas of science, math and computers.... [E]ntry level Chemical Operators are expected to have attained performance-based skill standards in the areas of mathematics, statistics, computer literacy skills, communication skills and workplace skills, and general plant skills.... Trends uncovered by the DOE study show that as Chemical Operator jobs have become more technical and complex, chemical companies are no longer able to take employees with little or no formal training and train them in math and science on-the-job.

Chapman opined that Rohm and Haas' hiring criteria are "job related and consistent with business necessity in that the criteria have a manifest relationship to the Chemical Operators' employment and substantially promote the proficient operation of Rohm and Haas' business."

The hiring criteria have been used by Rohm and Haas since September 1994. Clift states that the use of the hiring criteria has "been an unqualified success from both a cost and performance standpoint." For example, the training process for the employees who moved from the Plexiglas operation to the chemical operation in 1986 required from six to twelve months, depending on the individual. In 1994, the training process for new employees who met one or more of the criteria was only three to six months, resulting in an estimated savings of $872,256 in training costs for the employees hired under the criteria.

The plaintiff disputes that the hiring criteria are necessary or related to the jobs for which they applied. In support of their position, the plaintiffs have submitted the affidavits of Fred D. Wyrick (Exh. 3 to doc. 23), David McGill (Exh. A to doc. 37), Tommy Steele (Exh. B to doc. 37), and Joe Cronan (Exh. C to doc. 37). Fred Wyrick worked as an hourly employee at the Knoxville Rohm

and Haas plant from 1962 until his retirement in October 1996. He worked at the Plexiglas operation until 1971 but successfully bid on a job in chemical operations at that time. Wyrick states that he received on-the-job training for every job he did in chemical operations. In 1989, Wyrick was asked to help develop training material for chemical operators in the polymers department because he was the oldest experienced chemical operator working in polymers at the time. Wyrick developed instructions for setting up, loading, operating, transferring, and sampling on the various chemical units, and then developed tests and evaluations to verify the trainees' level of knowledge. He states that there is no mention of chemistry or math in any of the training materials he developed, nor do any of the tests and evaluations ask questions related to these two subjects.

Wyrick states that in the early 1990's the chemical operators had to manually input product parameters for each different product into the computers, and there was a possibility of operator error in this process. Subsequently, Rohm and Haas decided to put a "recipe" for each product into the computer, so now the chemical operators need only "interface" with the computer and acknowledge prompts to verify. This process has reduced operator error to almost zero.

Wyrick says that the training of the employees who transferred from the Plexiglas operation in 1987 was difficult and had to be extended because many of these trainees did not want to transfer but would lose their jobs otherwise, and the trainers were often training their own replacements. Interestingly, Wyrick also says that the period for training had to be extended because of the age of the trainees (in their mid-fifties). *See* Affidavit of Fred Wyrick, ¶ 27. Of these trainees, Wyrick trained five in "pumping."

It is Wyrick's opinion that any skills chemical operators need are acquired after they are hired, either through classroom or on-the-job training. He further believes that competency in chemistry and math is not necessary. Wyrick states that he has trained sixty-five newly hired operators since 1994, and these new employees who met the criteria did not learn any faster than those who did not meet the criteria.[4]

In accord with Wyrick's opinion are David McGill, Tommy Steele, and Joe Cronan. McGill was involved with some on-the-job training in the polymers department. He believes that it was harder to train the new employees who met the criteria but who had never worked for Rohm and Haas before than to train former Rohm and Haas employees. He also believes that knowledge of chemistry and math and computer skills are not necessary to be a chemical operator.

Steele believes that the job of a chemical operator is easier today than it was in the early 1990's. He says that the educational level of the employees does not matter because Rohm and Haas trains all new employees once they are hired. Cronan agrees with this opinion.

Rohm and Haas submitted a second affidavit of Ray Clift [attached to doc. 45], in which he says that Wyrick trained no more than five employees hired under the new hiring criteria because nearly all the employees hired or recalled since 1993 were assigned to emulsions. Two of these five had prior chemical plant experience and three had the necessary associate degrees from Pellissippi State. All other employees whom Wyrick would have trained in polymers had prior training and experience in emulsions. Clift says that hourlyemployed trainers such as Wyrick were not qualified to teach the more technical subjects such as chemistry and statistics, so it is not surprising that he did not train chemical operators in these subjects.

Between March 1, 1993, and January 10, 1994, Rohm and Haas hired thirty-one chemical operators from other Rohm and Haas chemical plants.[5] These employees had ei-

---

4. In his second affidavit, David A. Boatman [attached to doc. 45] says that the company's records show that only twenty-five persons, rather than sixty-five, bid into or were transferred into polymers from June 1992 to Wyrick's retirement in 1996, so Wyrick could not have trained sixty-five employees as claimed.

5. Rohm and Haas offered positions to fifty-five former Knoxville employees, but only thirty-one accepted the offer.

ther resigned in 1986–87 or were laid off from the Knoxville Plexiglas operation in 1987 and had accepted employment in chemical operations at Louisville, Kentucky, Houston, Texas, or Bristol, Pennsylvania. Although the hiring criteria were not in effect at that time, each of these thirty-one employees met the hiring criteria in that they each had five years relevant experience in a chemical plant. The average age of these employees was fifty-two at the time they were hired in 1993–94.

It is undisputed that all employees hired since September 1994 when the hiring criteria came into effect meet one or more of the criteria. It is also undisputed that some persons who applied for jobs and who appear to have met the criteria were not hired.[6] Between March 1, 1993, and July 1, 1996 (the date Browning and Eledge filed their EEOC discrimination claim), seventy-two employees were hired into hourly-paid positions, seventy-one as chemical operators. Fifty-two percent of these employees were forty years of age or older.[7] As of June 1997, 208 persons were employed in hourly-paid bargaining positions at the Knoxville plant, seventy-two percent of whom are over forty years of age, with the average age being forty-nine.

The plaintiffs argue that there were only sixty-one "new hires"; that is, new employees hired "off the street," from September 1994 to December 1996, and only four of these "new hires" were over the age of forty. The plaintiffs evidently have chosen December 1996 as a cut-off to compile their statistics because that is when this civil action was filed. Nevertheless, in its reply brief, Rohm and Haas says that the plaintiffs' figures are incorrect; that eighty-one employees have been hired under the new criteria since Sep-

tember 1994; and that fourteen of them were over the age of forty when they were hired.[8]

On July 1, 1996, Browning and Eledge filed EEOC complaints. At the time, neither plaintiff had applied for a position with Rohm & Haas, but on July 8, 1996, Browning submitted an unsigned application for employment as a chemical operator, and on September 17, 1996, Eledge also submitted an application for employment. Both plaintiffs were denied employment because Rohm and Haas believed the plaintiffs did not meet the hiring criteria.

### LEGAL DISCUSSION

■ Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories and admissions of file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Sixth Circuit has expressly adopted a trilogy of United States Supreme Court cases which clarified the standards for summary judgment under Rule 56. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989) (adopting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In summary, these cases hold that in order for a non-moving party to defeat a motion for summary judgment, the non-moving party must come forward with persuasive evidence to support his or her claim that there is a genuine factual dispute; that is, the non-

**6.** Several former employees have submitted affidavits setting out their qualifications and claiming that they met the criteria but were not hired by Rohm and Haas [attached to doc. 23]. Of these former employees, only Robert H. Elwood arguably meets the criteria, but Boatman says in his second affidavit that Elwood was not hired due to performance problems during his prior employment. Another former employee, John Joseph Chumlea, applied for a millwright position which must be filled per the collective bargaining agreement's internal bidding procedures. The others, Paul Michael McClain, Gary Lynn

White, Fate Nix, Daniel Butler, and Chris Van Connaster, did not meet the hiring criteria in the opinion of Rohm and Haas. Their experience or degrees (in the case of Connaster) were not relevant chemical experience.

**7.** This includes the thirty-one employees who transferred back to the Knoxville plant and who were all over the age of forty.

**8.** It is not clear from the defendant's reply brief what date the company is using as a cut-off.

moving party must produce evidence on which the jury could reasonably find for the non-moving party. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)). "[T]his standard requires a court to make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than *de minimus.*" *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997).

■ Although the plaintiffs' claims are brought under both the ADEA and the Tennessee Human Rights Act, the Tennessee courts have made it clear that Tennessee Human Rights Act actions are to be analyzed using the case law the federal courts have developed in applying corresponding federal discrimination statutes. *See Silpacharin v. Metropolitan Government of Nashville and Davidson County*, 797 S.W.2d 625, 629 (Tenn.Ct.App.1990); *Bruce v. Western Auto Supply Co.*, 669 S.W.2d 95, 97 (Tenn.Ct.App. 1984). Thus, the plaintiffs' claims and the defendant's motion for summary judgment will be considered without distinction between the ADEA and the Tennessee Human Rights Act.

### A. *Plaintiffs' Legal or Contractual Right to Be Rehired*

■ As a preliminary matter, the court needs to consider whether the plaintiffs had any entitlement to be recalled or rehired because of their prior employment with Rohm and Haas. In their affidavits attached to their response to the motion for summary judgment, Browning and Eledge say that they were told that they would be given a priority for rehiring even if their recall rights had expired; thus, they imply that they had a right to be rehired before Rohm and Haas hired any new employees "off the street." Both plaintiffs say that they had been laid off prior to 1982 but were recalled, and expected that they would be recalled again after their 1982 lay off. They say that Rohm and Haas never notified them in 1993 when the company started to accept applications for chemical operators. At oral argument, counsel for the plaintiffs said that Rohm and Haas "led them to believe" that they would rehired because they were told to keep their addresses current in the personnel office. Rohm and Haas denies that the plaintiffs were told that they would be given indefinite priority for jobs after their recall rights had expired.

■ "Seniority rights [providing for recall or rehiring preferences] are not inherent in an employee-employer relationship, but rather, exist only to the extent that they are created by contract." *N.L.R.B. v. District 23, United Mine Workers of America*, 921 F.2d 645, 649 (6th Cir.1990). In the present case, it is undisputed that the plaintiffs' contractual rights to be recalled or rehired under various collective bargaining agreements expired on March 1, 1989, seven years after their lay off. The court finds that once these contractual rights expired, the plaintiffs "were situated no differently from the general public as far as hiring decisions were concerned," and Rohm and Haas was under no legal or contractual obligation to rehire them. *See Abbott v. Federal Forge, Inc.*, 912 F.2d 867, 873 (6th Cir.1990). The plaintiffs appear to concede this in their response: "Plaintiffs in this case and the companion cases would be in the same position as these new hires since plaintiffs no longer worked at Rohm and Haas and their recall rights had expired." [*See* doc. 23, at p. 21]. The fact that the plaintiffs may have been told to keep their addresses current with the company does not create any duty on the part of the company to rehire the plaintiffs once their recall/rehire rights created by the collective bargaining agreement had expired.

The court finds that the plaintiffs' prior employment with Rohm and Haas is only relevant insofar as it might relate to the plaintiffs' prior work experience, and their status with Rohm and Haas was no different than that of any other member of the public. The plaintiffs had no special entitlement to be informed of future job openings, of the implementation of hiring criteria, or of scholarships to Pellissippi State. *C.f. Wanger v. G.A. Gray Co.*, 872 F.2d 142, 146 (6th Cir. 1989) (where employer and former employee

are "strangers" employer not obligated to consider former employee for rehire).

## B. Plaintiffs' Disparate Treatment Claim

In its motion for summary judgment, the defendant first argues that the plaintiffs' claims are insufficient to make out a claim for disparate treatment under the ADEA. "Liability in a disparate treatment case depends on whether the protected trait actually motivated the employer's decision. ... 'Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.'" *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997) (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977)). In order to show that age was the motivating factor in the defendant's decision not to hire the plaintiffs as chemical operators, the plaintiffs may present direct evidence of the defendant's improper motive or present evidence from which the trier of fact could infer the defendant's improper motive. *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir.1994).

In the present case, the plaintiffs have not presented the court with any direct evidence that the defendant did not hire them as chemical operators because of their age. The hiring criteria are "age neutral" on their face,[9] and the undisputed proof is that all persons hired since the criteria were adopted (and even before, if one considers the transferees from the defendant's other chemical plants) met one or more of the criteria.

Therefore, the plaintiff must present evidence from which a jury could infer that the defendant failed to hire the plaintiffs because of their age. Under this last method, the courts have traditionally modified and employed the analysis articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) to test the sufficiency of the plaintiffs' evidence. *See*

*Hartsel*, 87 F.3d at 795; *Manzer*, 29 F.3d at 1081.

To establish a *prima facie* case of age discrimination under the *McDonnell Douglas* test, the plaintiffs must introduce evidence that (1) they are members of a protected class; (2) they applied for and were qualified for jobs with the defendant company; (3) they were not hired; and (4) the defendant company continued to seek applicants with the plaintiffs' qualifications. *See Wooden v. Board of Educ. of Jefferson County*, 931 F.2d 376, 378 (6th Cir.1991). "This proof 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Manzer*, 29 F.3d at 1081 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). The plaintiff bears the burden of production and persuasion on all four of the elements, and if all four elements have been proven, then a presumption of age discrimination arises. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir.1990). If the plaintiffs succeed in proving their *prima facie* case, then the burden of production shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for not hiring the plaintiffs. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Manzer*, 29 F.3d at 1082; *Wooden*, 931 F.2d at 378. Should the defendant employer carry this burden of production, the plaintiffs "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer*, 29 F.3d at 1083.

Even assuming that the plaintiffs in this case can establish the first and third of their *prima facie* case, the defendants argue that the plaintiffs cannot establish the second element—that they were qualified for the positions they sought. Since this is also the defendant's legitimate, non-discriminatory reason for failing to hire the plaintiffs, the issue of whether the plaintiffs have proven a *prima facie* case and whether the defendant's explanation was pretextual will necessitate only one discussion. It is undisputed that Rohm and Haas has only hired chemical

---

9. In their reply brief, the plaintiffs claim that the hiring policy adopted by the defendant was not

age neutral, but without any explanation for the basis of such a claim. *See* doc. 37, pp. 8–9.

operators who meet one or more of the hiring criteria, so the plaintiffs cannot establish the fourth element of their *prima facie* case, either.

### 1. Were Plaintiffs Qualified for the Positions They Sought?

■ The plaintiffs make two arguments on this issue: (1) that their prior experience in the Plexiglas operation satisfies the hiring criteria and (2) in any event, the hiring criteria are a sham because chemical operators do not need the skills listed in the hiring criteria. First, the plaintiffs argue that they are qualified for jobs as chemical operators because of their prior work experience in the Plexiglas operation. The plaintiffs say they handled chemicals while working in the Plexiglas operation and, in any event, Rohm and Haas is a chemical plant and so they have more than five years' experience in a chemical plant. It is the opinion of management of Rohm and Haas that the plaintiffs' time in the Plexiglas operation was not relevant experience, even if they did handle chemicals.

■ Initially, it should be noted that no issue of fact is created by an applicant's perception that he or she is qualified for a particular position contrary to the company's belief that the applicant is not qualified, as long as the company's belief is not improperly motivated. *See Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir.1987), *cert. denied*, 484 U.S. 1067, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988) (in the context of a Title VII case, court looks to the employer's motivation, not the applicant's perceptions, or even an objective assessment, of what qualifications are required for a particular position); *Grauer v. Federal Express Corp.*, 894 F.Supp. 330, 334 (W.D.Tenn.1994), *aff'd* 73 F.3d 361 (6th Cir. 1996) (no issue of fact created by plaintiff's subjective belief that she was more qualified than another applicant). As the Sixth Circuit said in *Wrenn*, it is the employer's motivation and intent that is at issue, not its business judgment. *Wrenn*, 808 F.2d at 502; *see also Grauer*, 894 F.Supp. at 334 (employee's subjective belief is a mere disagreement with the corporation's business judgment, and does not create an issue of fact).

In his affidavit, Ray Clift describes the work in the Plexiglas operation as follows:

[I]t was a highly mechanized process with little or no computerization. The work was manual in nature and the approximately 250 employees worked in processes that required mostly hands-on operations such as placing "spacer" on glass molds by hand, inserting "mold clamps" into a clamp applicator machine by hand, filling completed molds by hand, lifting Plexiglas sheet from conveyer lines and placing them on "L" frames for manual transport, manually operating large table saws to cut sheet to size, constructing shipping boxes, filling and packaging boxes by hand. Other operations required the use of forklifts and other manually operated transport equipment.... The needed skills involved developing the production line routing and the speed necessary to keep pace with the mechanized production line producing approximately 1600 sheets of Plexiglas each shift or one Plexiglas sheet each 15 seconds. The education level required was high school level or less....

A review of the plaintiffs' respective work experience in the Plexiglas operation reflects the type of work described by Clift. Browning primarily worked cleaning up and disposing of chemicals in the mold filling department. Eledge worked in shipping, stock cutting, mold making, polishing, and other such jobs.

Clift says that the chemical operation was always more complex than the Plexiglas operation and more training of employees was required. Clift describes the job of a chemical operator as follows:

Since 1987 the typical employee in the Chemical Area must have the knowledge and skill to work with computers to operate large chemical reactors and other large chemical vessels.... From a computer console using up to 30 computer generated process control schematics (Computer screens), the operator via the keyboard produces thousands of pounds of chemical product totally unseen. The employee can be called on to operate up to five different polymerization reactors, many using a different computer control systems [sic]....

Knowledge of the computerized equipment, operation of computers and computerized controls and being able to follow several hundred standard operating and work procedures is critical to the safety, quality and productivity of the process. Being able to control the chemical reaction and troubleshooting the production process is vital. Standard Operating Procedures must be used to communicate the instructions and the relevant percentages, weights, pound, pH, viscosity's quality sampling, etc.

The need for a chemical operator to have computer and other advanced skills is reinforced by Ronald A. Lehman, the Area Manager of the Polymers Department at the Knoxville plant and the Worldwide Manufacturing Manager for the Formulation Chemicals business unit of Rohm and Haas. He says, "Now it is virtually impossible to work in a chemical operator's job without being adept and knowledgeable in computers.... [O]perators must be able to work, troubleshoot, and problem solve, independently, with a minimum of supervision." *See* Affidavit of Ronald A. Lehman, attached to doc. 16. Lehman goes on to describe the particular processes and operations in both the emulsions and polymers departments that require a basic knowledge of organic chemistry and mathematics. He says that the goal of the Knoxville plant is to have a self-regulated work team with an ability to understand and adapt to mathematical and chemical variables that occur daily.

The court finds that there is no genuine issue of material fact that the plaintiffs' prior work experience in the Plexiglas operation is not "relevant" experience in a chemical plant for purposes of satisfying one of the hiring criteria.[10] Nothing the plaintiffs did while working in the Plexiglas operation would have prepared them to be chemical operators. This conclusion is supported by another statement found in Clift's affidavit. Clift points out that in 1987 when the senior Plexiglas operation employees were transferred to the chemical operation, the initial training period for the groups of employees was two

months. This was not sufficient time to train these employees in anything more than a narrow segment of the work, *i.e.*, pumping. Clift says, "It was evident that work experience in Plexiglas of whatever duration was not relevant to the work in chemical operations and did not prepare the employee for work in chemical operations."

## 2. Are the Hiring Criteria a Pretext for Age Discrimination?

The plaintiffs' second argument is that the hiring criteria are a pretextual barrier to hiring older workers because they are not necessary; everyone who is hired has to undergo training. The plaintiffs argue that Rohm and Haas adopted the hiring criteria to avoid hiring older persons who would be eligible to draw pension and retirement benefits. The defendant contends that there is no issue of fact that the hiring criteria were not adopted for impermissible reasons (*e.g.*, to hide an intent not to hire older persons), but, in fact, are related to the job performance of chemical operators and promote the proficient operation of the business. The defendant says that the plaintiffs should not be allowed to question its business decision to increase the skill level of its work force.

To reiterate, the issue in a disparate treatment case is whether age motivated the employer's decision. An age discrimination claim cannot proceed unless the employee's age actually played a role in the employer's decision-making process and had a determinative influence on the outcome. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). A plaintiff has not met his or her burden of showing a genuine issue of material fact on the issue of pretext merely by casting doubt on the employer's legitimate reasons for its business decisions. *See Irvin v. Airco Carbide,* 837 F.2d 724, 726 (6th Cir.1987); *see also Wilkins v. Eaton Corp.,* 790 F.2d 515, 521 (6th Cir.1986) (the focus is not on the soundness of the employer's business judgment). However, just because an employer offers a business judg-

---

**10.** Whether knowledge of chemistry, mathematics, and computer skills are reasonable requirements of a chemical operator's job will be discussed in the next section of the court's opinion. What is important at this point is that it is undisputed that neither plaintiff has these skills.

ment rationale does not mean that the employer will prevail on a motion for summary judgment. *Hartsel v. Keys,* 87 F.3d at 800.

In the present case, however, Rohm and Haas has supplied the court with overwhelming evidence that the hiring criteria were adopted for the purpose of increasing the skill level of its chemical operators. A committee was formed to investigate the company's needs, and the committee determined that if potential employees met certain hiring criteria, the company's workforce could keep the company competitive in the market. The plaintiffs have not provided the court with a single bit of evidence that the hiring committee's work and the company's adoption of the committee's recommendation were motivated by a desire to avoid hiring older workers.

Instead, the plaintiffs ask the court to find that there is an issue of fact concerning whether the hiring criteria are at all related to the job of chemical operator. In support of this argument, the plaintiffs rely on the affidavits of several hourly employees who believe that knowledge of chemistry, math, and computers is not necessary because the chemical operator's job is easier today than it was just a few years ago.[11] Wyrick, McGill, Steele, and Cronan all state that it is their opinion that on-the-job training and a manual is all that is required to be a chemical operator.

The court finds the recent Sixth Circuit opinion in *Hartsel* instructive on this issue. In *Hartsel,* the plaintiff had been denied a promotion to Superintendent of the Utilities Department. She had been the Acting Superintendent for over half a year. The defendants claimed that the plaintiff was not promoted because she lacked the computer skills "necessary to assist in the upgrade of computers in the Public Utilities Department." *Hartsel,* 87 F.3d at 799. There was evidence before the court that the City had purchased an expensive and complex computer and that the computer system was in use. A younger man with the necessary computer skills was hired as Superintendent.

Hartsel complained that the defendants discriminated against her because of her age and sex. *Id.* at 797. Several of her co-workers supplied affidavits to the court which were to the effect that the plaintiff should have been promoted because she did a good job. One co-worker stated that she believed that it was not necessary to appoint someone with a data processing background. Concerning these affidavits, the Sixth Circuit stated:

> these affidavits miss the point. . . . The law does not require employers to make perfect decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons. These affidavits reveal perhaps a reasonable difference in opinion, but their bald assertions and conclusory statements fail to provide any factual support for Hartsel's claim of sexist, ageist, or politically retaliatory animus.

*Id.* at 801.

The court finds that the affidavits in this case likewise miss the point. Wyrick's perception that training is all that is needed is based on his experience training employees who, with the exception of five 1987 transfers from Plexiglas to the chemical operation, either met the criteria or had been extensively trained in emulsions prior to transferring to polymers. The five 1987 transfers were trained only in one phase of a chemical operator's job, pumping, and by Wyrick's own admission, it was difficult to train for this one task because the employees did not want to be there and because of their age. Thus, Wyrick has no well-founded basis for his opinion that there is no difference in the training of new employees who meet the hiring criteria versus those who do not. Further, Wyrick did not train in the complicated areas of chemistry and statistics because he was not qualified to do so. The affidavits of McGill, Steele and Cronan, like the affidavits in *Hartsel,* reveal no more than a reasonable difference in opinion, not an

---

**11.** Interestingly, the reason given for believing that the chemical operator's job is easier today is because it has been computerized. Of course, at the time the hiring criteria were adopted, the "recipes" were not being used to set up the chemical processes, and there were operator errors.

issue of fact making summary judgment inappropriate.

In any event, the evidence before the court supports Rohm and Haas' use of the hiring criteria. Any employer is entitled to improve the quality of its workforce by hiring persons with more experience and/or education than had been required before, especially in a chemical plant with rapidly expanding technology. In the opinion of Rohm and Haas, this policy has already paid off in reduced costs of training new employees.

 As to the plaintiffs' argument that the defendant adopted the hiring criteria to avoid hiring older workers who would soon qualify for pension and retirement benefits, the Supreme Court, in *Hazen Paper*, made it clear that even if the employer is motivated by factors that are correlated with age, such as pension or retirement status, this does not mean that the employer has violated the ADEA. *Hazen Paper*, 507 U.S. at 613, 113 S.Ct. at 1707–08. The Court found that the problem of inaccurate and stigmatizing stereotypes related to age disappears when the employer's action is motivated by factors other than age. *Id.* at 611, 113 S.Ct. at 1706. Thus, the plaintiffs' suggestion that the adoption of the hiring criteria was to avoid having to pay older workers' pension and retirement benefits is to no avail. The plaintiffs have failed to present the court with any evidence that age, with its inaccurate and stigmatizing stereotypes, played any part in Rohm and Haas' decision to implement the hiring criteria.

 The plaintiffs believe that it is somehow relevant that other Rohm and Haas chemical plants have not adopted and implemented hiring criteria like the Knoxville plant. The plaintiffs believe it particularly telling that the Houston plant does not use such criteria, although the Louisville plant does use them. The court cannot understand the relevance of this fact. Surely an employer with several different plants is not required to have uniform hiring policies among the plants. A lack of such uniformity among the plants

different plants cannot give rise to an inference of an impermissible hiring policy.

## C. Disparate Impact

Next, the defendant argues that the plaintiffs cannot make out a case of disparate impact. The defendant says that a disparate impact analysis is not applicable to ADEA cases, and even if it is, the plaintiffs cannot show that the defendant's hiring criteria have an impermissible disparate impact on older employees. The plaintiff argues that disparate impact is a cognizable theory under the ADEA in the Sixth Circuit and that the defendant cannot show that its hiring criteria are a business necessity.

### 1. Does Disparate Impact Liability Apply to ADEA cases? [12]

Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive . . . is not required under a disparate impact theory." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993) (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). The only issue before the United States Supreme Court in *Hazen Paper*, was the plaintiff's disparate treatment claim under the ADEA. However, the Supreme Court stated, albeit in dicta, that it had never decided "whether a disparate impact theory of liability is available under the ADEA . . . ." *Hazen Paper*, 507 U.S. at 610, 113 S.Ct. at 1706. In his concurring opinion, Justice Kennedy remarked, "nothing in the Court's opinion should be read as incorporating in the ADEA context the so-called 'disparate impact' theory of Title VII of the Civil Rights Act of 1964 . . . [T]here are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA." *Id.* at 618, 113 S.Ct. at 1710 (Kennedy, J., concurring).

---

**12.** The American Association of Retired Persons (AARP) has filed a brief in support of the plaintiffs' position on the issue of whether a disparate

impact theory of liability is available under the ADEA. *See* doc. 54.

Primarily because of the Supreme Court's language in *Hazen Paper,* several circuit courts of appeal have determined or strongly intimated that disparate impact liability does not attach in an ADEA case. *See DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 732–34 (3d Cir.1995), *cert. denied,* 516 U.S. 916, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995) (strongly intimating that there is no disparate impact liability under the ADEA), *Martincic v. Urban Redevelopment Auth. of Pittsburgh,* 844 F.Supp. 1073, 1076–77 (W.D.Pa.), *aff'd,* 43 F.3d 1461 (3d Cir.1994) (holding that there is no disparate impact liability under ADEA); *Gehring v. Case Corp.,* 43 F.3d 340, 342 (7th Cir.1994), *cert. denied,* 515 U.S. 1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995) (disparate impact theory of liability unavailable in Seventh Circuit); *Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 987 (10th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997) (disparate impact claims not cognizable under the ADEA).

Other circuit courts of appeal have recognized the issue, and continue to assume, often without any discussion, that disparate impact liability applies to ADEA claims. *See Graffam v. Scott Paper Co.,* 60 F.3d 809 (1st Cir.1995) (assuming arguendo that disparate impact analysis applies, but recognizing the issue); *District Council 37 v. New York City Dep't of Parks and Recreation,* 113 F.3d 347, 351 (2d Cir.1997) (relying on Second Circuit precedent decided before *Hazen Paper* ); *Lyon v. Ohio Education Ass'n,* 53 F.3d 135, 139–40 n. 5 (6th Cir.1995) (recognizing that there is considerable doubt whether an ADEA claim can exist under a disparate impact theory); *Smith v. City of Des Moines,* 99 F.3d 1466, 1469–70 (8th Cir.1996) (recognizing the issue, but following Eighth Circuit, post-*Hazen Paper* precedent); *Mangold v. California Public Util. Comm'n,* 67 F.3d 1470, 1474 (9th Cir.1995) (recognizing the issue, but following Ninth Circuit, pre-*Hazen Paper* precedent); *Koger v. Reno,* 98 F.3d 631, 639 (D.C.Cir.1996) (assuming without discussion that disparate impact analysis applies in ADEA cases).

Prior to *Hazen Paper,* the Sixth Circuit allowed a disparate impact claim to proceed under the ADEA. *See Abbott v. Federal Forge, Inc.,* 912 F.2d 867, 872 (6th Cir.1990). Since that time, the Sixth Circuit, while recognizing that disparate impact theories of liability may not apply in ADEA cases, has not decided the issue one way or the other. *See Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042 (6th Cir.1998); *Lyon,* 53 F.3d at 139–40 n. 5; *see also Brothers v. NCR Corp.,* 885 F.Supp. 1043, 1049 (N.D.Ohio 1995). In the absence of express statutory language precluding disparate impact claims under the ADEA, or a clear holding of the United States Supreme Court or the Sixth Circuit disallowing such claims, this court will assume, without deciding, that the plaintiffs can raise a disparate impact claim in this age discrimination case.

### 2. Do the Hiring Criteria Have a Disparate Impact on Older Applicants?

 Assuming that disparate impact liability applies in an age discrimination case such as this one, to establish a *prima facie* case of age discrimination under this theory, the plaintiffs must show that (1) the employer has a specific employment practice; (2) there is an adverse impact on older potential employees (usually proven by statistical evidence); and (3) there is a causal relationship between the practice and the adverse impact. *See Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 657, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989).[13] If the plaintiffs are able to make out a *prima facie* case under a disparate impact theory, then the burden of production shifts to the defendant to show that the hiring criteria are a "business necessity." *Wards Cove,* 490 U.S. at 658, 109 S.Ct. at 2125. The court must consider not only the employer's justifications for its business practices, but also the availability of alternative practices to achieve the same business ends. *Id.*

 In its motion for summary judgment, the defendant argues that the plaintiffs cannot establish a *prima facie* case under a disparate impact theory because they cannot

---

**13.** *Wards Cove* is a Title VII case, but the disparate impact analysis would apply to this age discrimination case, as well. *See Abbott v. Federal Forge, Inc.,* 912 F.2d 867, 872 (6th Cir.1990).

show that there has been an adverse impact on older potential employees or that the hiring criteria adopted by the company "caused" any adverse impact on older potential employees. First, on the issue of whether the hiring criteria have resulted in an adverse impact on older employees, generally plaintiffs must come forward with statistical evidence showing that the employer's business practices, although facially neutral, have an adverse impact on a particular group of employees, in this case, older employees. *See Wards Cove*, 490 U.S. at 650–51, 109 S.Ct. at 2121. The only statistical evidence upon which the plaintiffs rely is found in an attachment to the affidavit of plaintiff Eledge which shows the birth dates of the newly hired chemical operators at Rohm and Haas from March 1993 to October 1996.[14] That attachment shows that seventy-one persons were hired as chemical operators from March 1993 to July 1, 1996. Of these seventy-one persons, thirty-six were age forty or older. The plaintiffs, however, urge the court to consider only those employees hired from September 1994 to December 1996, when the plaintiffs filed their lawsuit in this court. If the court considers this group of sixty-three employees, six were over the age of forty when hired. The court finds that the proper group of newly hired employees to be considered are those hired after the hiring criteria went into effect but before the plaintiffs filed their EEOC complaint. In this period from September 1994 to July 1, 1996, Rohm and Haas hired forty new chemical operators, five of whom were over forty years old when hired. As of June 1997, 208 persons were employed in hourly positions at the Knoxville plant, seventy-two percent of whom were forty years old or older.

Whichever group of newly hired chemical operators is used, the plaintiffs have the burden of comparing the ages of the qualified available persons in the labor market with those who were actually hired. *See Wards Cove*, 490 U.S. at 650–51, 109 S.Ct. at 2115; *Abbott v. Federal Forge, Inc.*, 912 F.2d

867, 873–74. The only attempt at such a comparison is the plaintiffs' assertion in their sur-reply brief, pp. 13–14, that forty-nine percent of the relevant labor pool in the Knoxville area is over the age of forty.[15] This comparison is too broad. The relevant labor pool in the Knoxville area surely includes persons who may or may not be able to read and write, may or may not have a high school education, and may or may not even be seeking employment. Thus, the relevant labor pool in Knoxville cannot be the proper group to compare with the persons actually hired as chemical operators, since that labor pool is neither qualified nor available. The proper group for comparison would be that part of the labor pool which is qualified and available. As the Supreme Court pointed out in *Wards Cove*, if the court allowed the kind of comparison that the plaintiffs suggest here, any employer whose workforce had fewer workers over the age of forty than the general labor pool "could be haled into court and forced to engage in the expensive and time-consuming task of defending the "business necessity" of the methods used to select the other members of the workforce." *Wards Cove*, 490 U.S. at 652, 109 S.Ct. at 2122.

In addition to the plaintiffs' attempted comparison of newly hired employees with the relevant labor pool in the Knoxville area, the plaintiffs say in their sur-reply brief: "There would be no way for the plaintiffs to garner the statistics needed using the defendant's proposed procedure [comparing the ages of the newly hired employees with the qualified available labor pool]. It would take questioning each member of the labor pool." Thus, the plaintiffs recognize that other comparisons could be made, but with difficulty.

Even if the court assumes the plaintiff has shown an adverse impact on older workers by identifying a group in which only ten percent of the newly hired chemical operators were age forty or over, the plaintiffs still must show that the adverse impact was **caused** by the defendant's hiring

---

**14.** The cut-off for comparing the ages of the newly hired chemical operators, however, should be the date the plaintiffs filed their EEOC claim, July 1, 1996.

**15.** The plaintiffs have not defined "relevant labor pool," so the court will assume it means the entire labor pool in the Knoxville area.

criteria. *See Wards Cove*, 490 U.S. at 657, 109 S.Ct. at 2124–25. What the plaintiffs must demonstrate is that the defendant's hiring criteria have a significantly disparate impact on employment opportunities for older and younger employees. *Id.*

The court concludes, after considering each of the hiring criteria individually, that the plaintiff has not and cannot show that the hiring criteria caused any disparate impact on older workers. First, it appears to the court that the criterion requiring five years' experience in chemical plant operations weighs in favor of older employees. Young persons just starting out in the job market would not have this experience, whereas older employees could have gained this required experience. The court finds that no reasonable trier of fact could conclude that requiring five years' relevant chemical operator experience causes a disparate impact on older workers.

Next, if the applicant does not have chemical operator experience, a relevant four-year degree from an accredited college or university will suffice. The plaintiffs have not provided the court with any evidence that a college degree in a relevant field is an advantage that younger employees have over older employees. The court finds that no reasonable trier of fact could conclude, based on the evidence before the court, that requiring a relevant four-year degree from an accredited college or university causes a disparate impact on older workers.

Finally, an applicant will be considered for a position as a chemical operator if he or she has an Associate Degree in Chemical and Environmental Engineering Technology from Pellissippi State, or an equivalent degree from another school. Once again, the plaintiffs have not provided the court with any evidence that a two-year associate degree is an advantage that younger employees have over older employees. There is no evidence that younger persons are more likely to earn a degree in the Chemical and Environmental Engineering Technology program at Pellissippi State or any other community college. The court finds that no reasonable trier of fact could conclude, based on the record before the court, that requiring an Associate Degree in Chemical and Environmental Engineering Technology from Pellissippi State, or an equivalent degree from another school, causes a disparate impact on older workers.

Therefore, the court finds that the plaintiffs have failed to establish their *prima facie* case of disparate impact. Nevertheless, the court will assume for the sake of argument that the plaintiffs have overcome this hurdle, and will address the next part of the analysis; that is, whether the defendant can show a reasonable business necessity for adopting the hiring criteria. The court has already discussed Rohm and Haas' business justification for adopting the hiring criteria, and that discussion will not be repeated here. *See* B.2, *supra.* The court finds that there is no genuine issue of material fact that the hiring criteria were designed to meet legitimate business ends; that is, to increase the chemical operators' skill levels without extensive training costs.

Finally, on the issue of whether there are alternative practices that would achieve the same business ends, the plaintiffs suggest only that on-the-job training is a reasonable alternative practice to would achieve Rohm and Haas' business goals. The evidence before the court is that on-the-job training costs are much higher when the employees do not meet the hiring criteria, so this is not a reasonably alternative for the company. In the absence of any other alternatives, the plaintiffs have failed to rebut the defendant's business necessity defense.

The court finds that even if a disparate impact liability theory applies in age discrimination cases, the plaintiffs have failed to raise a genuine issue of material fact that Rohm and Haas' hiring criteria caused an adverse impact on older applicants for chemical operator positions, or that the hiring criteria were not adopted for legitimate business reasons.

### CONCLUSION

For the reasons stated above, the court finds the plaintiffs have failed to make out a case of age discrimination under either a disparate treatment or disparate impact theory. Therefore, the defendant's motion for

summary judgment will be granted, and an Order reflecting this opinion will be contemporaneously entered.