*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0119p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

FREDERICK N. BONDURANT; MALCOLM D.
CORNER; ROBERT F. HOLLIKER; MARK E.
KUNNEN; DAVID P. MATHISON; Estate of
WILLIAM E. THOMPSON III,
          *Plaintiffs-Appellants*,

    *v.*

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL; NORTHWEST AIRLINES
MASTER EXECUTIVE COUNCIL,
          *Defendants-Appellees*.

No. 10-1904

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-15383—Marianne O. Battani, District Judge.

Argued: January 13, 2012

Decided and Filed: May 7, 2012

Before: MERRITT and COLE, Circuit Judges; VARLAN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Stephen K. Christiansen, VAN COTT, BAGLEY, CORNWALL & McCARTHY, Salt Lake City, Utah, for Appellants. James K. Lobsenz, ALPA LEGAL DEPARTMENT, Herndon, Virginia, for Appellees. **ON BRIEF:** Stephen K. Christiansen, VAN COTT, BAGLEY, CORNWALL & McCARTHY, Salt Lake City, Utah, for Appellants. James K. Lobsenz, ALPA LEGAL DEPARTMENT, Herndon, Virginia, Stuart M. Israel, LEGGHIO & ISRAEL, P.C., Royal Oak, Michigan, for Appellees.

_____

[*]The Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

---

**OPINION**

---

## I. Overview

MERRITT, Circuit Judge. The plaintiffs in this case, former Northwest Airlines pilots, appeal the district court's grant of summary judgment in favor of the defendants, the Air Line Pilots Association and the Northwest Airlines Master Executive Council (collectively "the union"). On appeal, the plaintiffs assert that the district court improperly granted summary judgment to the union in the face of record evidence that it (1) breached its duty of fair representation, in violation of the Railway Labor Act, 45 U.S.C. § 156 (2006) and (2) discriminated against the plaintiffs based on their age, in violation of the federal Age Discrimination in Employment Act, 29 U.S.C. § 623(c)(1), and Michigan's Elliot-Larsen Civil Rights Law, MICH. COMP. LAWS § 37.2204(a) (1977).

## II. Factual Background

This case arises from the 2005 Chapter 11 bankruptcy of Northwest Airlines, which occurred at about the same time as the bankruptcies of Delta, United, and others. Prior to and during its reorganization, which was for the purpose of reducing costs, Northwest extracted concessions from the union that collectively resulted in an approximate 40% wage cut for all Northwest pilots. These wage concessions were formalized into three agreements, the third of which superseded the prior two and granted the union a negotiated $888 million claim in Northwest's bankruptcy to be disbursed as shares of Northwest stock. Northwest and the union determined that the third agreement, termed the Bankruptcy Restructuring Agreement, would run from July 31, 2006 (a crucial date in this case because all of the plaintiffs retired prior to it) through December 31, 2011. Thus, the entire "concessionary period" – from the beginning of the first agreement on December 1, 2004 through the end of the Bankruptcy Restructuring Agreement on December 31, 2011 – totaled 85 months. Various Letters

of Agreement between the union and Northwest set out the terms of the Bankruptcy Restructuring Agreement and the wage concessions for which the $888 million claim was intended to compensate.

For the union, the challenge lay in allocating the claim. Letter of Agreement 2006-03 gave the Master Executive Council, composed of pilot representatives that coordinated the union's activities with Northwest, "the authority to determine the manner of distribution of such claim, including the distribution of equity on account of such claim, provided that the manner of distribution [was] legal and complie[d] with all applicable regulations." Pursuant to that authority, the Master Executive Council appointed an Eligibility Committee to issue a recommendation on how best to approach the task of distributing the claim. The Eligibility Committee reasoned that a pilot's share of the claim should ideally reflect the amount of time that the pilot worked during the 85-month concessionary period. Under this formula, a pilot would receive one month of eligibility credit per each month of active duty, entitling a pilot who worked for the entire 85-month period to a full claim share. However, the Eligibility Committee concluded that a literal implementation of this strategy would significantly delay distribution of the claim and create a risk that pilots would end up with worthless equity if Northwest entered into a second bankruptcy before December 31, 2011. Further, an early distribution would give pilots the ability to choose whether to participate in any pre-bankruptcy claim sales or to wait and collect their claims as part of Northwest's bankruptcy estate. The Eligibility Committee also sought to avoid litigation by protecting the interests of participants in the Pilot Early Retirement Program, an early retirement incentive program available to pilots over the age of 50. Otherwise, the Eligibility Committee posited, the union could be seen as encouraging early retirement on the one hand and punishing it on the other.

After weighing these various considerations, the Eligibility Committee ultimately recommended that the union establish July 31, 2006, the effective date of the Bankruptcy Restructuring Agreement, as a bright-line cutoff for determining which pilots would be eligible for full claim shares. The union accepted the recommendation, thereby creating

an obvious fiction that allowed it to presume that any pilot who was actively employed on the date when the Bankruptcy Restructuring Agreement became effective would remain employed through the agreement's termination more than four years later. By contrast, any pilot who retired or otherwise left Northwest employment prior to the cutoff date would receive a share of the claim equal to the actual number of months that the pilot worked during the 85-month concessionary period. All of the participants in the Pilot Early Retirement Program were scheduled to and did retire after the cutoff date. The eligibility formula also created benefits for any older pilots who retired after the cutoff date or who were selected to continue flying as "Second Officers" past the age of 60, the federally mandated retirement age for all pilots and copilots.[1] The plaintiffs are all normal retirees who reached the age of 60 and left Northwest before July 31, 2006.[2]

Despite retiring prior to the cutoff date, the plaintiffs initially believed that they would receive full claim shares.[3] However, Mark Shanahan, a member of the Eligibility Committee, advised them all by early March 2006 that they would each receive only 20 months of eligibility credit, reflecting the number of months of each plaintiff's active employment with Northwest during the concessionary period. The difference to each plaintiff between a full 85/85 share and a 20/85 share was well over $100,000. All of the plaintiffs voluntarily appealed the union's calculation of their eligibility credit. At its April 2007 meeting, the Master Executive Council rejected the plaintiffs' appeals, a decision that it made public to Northwest pilots via a "Hotline" announcement that it issued on April 25. The next day, on April 26, one of the plaintiffs e-mailed a copy of the "Hotline" announcement to the others. The Master Executive Council subsequently

---

[1]The Federal Aviation Administration (FAA) has since changed the mandatory retirement age to 65. *See* 14 C.F.R. § 121.383(d)(1).

[2]One plaintiff retired approximately seven weeks before his 60th birthday.

[3]Earlier in 2006, all of the plaintiffs opted into a partial claim sale through the union's website, which provided them with estimates of their respective claim shares. The website informed them all that they qualified for the full eligibility period. However, after reviewing the claim share estimates that the website produced, union decisionmakers corrected "hundreds of errors" including the estimates of the plaintiffs' claims. *Bondurant v. Air Line Pilots Ass'n*, 718 F. Supp. 2d 836, 836, 840 (E.D. Mich. 2010).

issued official letters to all plaintiffs on May 18 formally advising them that it had rejected their appeals. This lawsuit followed on November 12, 2007.

### III. Standard of Review

This court reviews a district court's grant of summary judgment *de novo. Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is only appropriate if the moving party can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In assessing a summary judgment motion, the reviewing court must view all of the facts in the light most favorable to the non-moving party, and then consider whether a jury, viewing the facts in that same light, could find in favor of the non-movant. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### IV. Duty of Fair Representation Claim

The plaintiffs assert that the union's decision to create a distribution scheme that included a cutoff date for full claim eligibility was both arbitrary and discriminatory and therefore a two-fold breach of the union's duty of fair representation. They do not allege that the union acted in bad faith. *See Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (describing the duty of fair representation as a conjunctive, "tripartite standard"). The district court concluded that the union's allocation of the Northwest claim was neither arbitrary nor discriminatory. We agree.[4] With respect to the arbitrariness prong of their claim, the plaintiffs point out that the cutoff date had the effect of granting full claim eligibility to a number of pilots, including participants in the Pilot Early Retirement Program, who retired well before

---

[4] As a preliminary matter, the union contends that the plaintiffs' unfair representation claim is barred by the six-month statute of limitations. *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 169-70 (1983). The district court did not address the statute of limitations question and instead proceeded to evaluate the merits of the plaintiffs' claim. Thus, we assume that the district court decided to equitably toll the statute of limitations until the plaintiffs received formal notice of the Master Executive Council's decision to reject their appeals on May 18, 2007, a date that falls within the scope of the limitations period. *See Robinson v. Cent. Brass Mfg. Co.*, 987 F.2d 1235, 1242 (6th Cir. 1993) (reasoning that "whether to toll the limitations period is a question within the discretion of the district court"). Presuming that the plaintiffs' unfair representation claim is indeed timely, we agree with the district court that it nonetheless cannot survive summary judgment on the merits.

December 31, 2011 but after July 31, 2006. And yet a challenged union action is arbitrary only if it is "so far outside a wide range of reasonableness" that it is "wholly irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991) (internal quotations omitted). This "highly deferential" examination of a union's performance is particularly appropriate in the present case. *Id.* The union, tasked with allocating $888 million in Northwest stock among thousands of pilots, was in a quandary. It wanted the distribution scheme to be compensatory, i.e., to reflect fairly the amount of time that each pilot worked during the 85-month concessionary period, but it also wanted to protect the value of the claim by distributing the shares quickly. The union's decision to create an eligibility cutoff date represented an admittedly imperfect compromise between these two "conflicting goals." (Br. of Defs.-Appellees 7.) Further, the date that the union selected, July 31, 2006, coincided with the beginning of the Bankruptcy Restructuring Agreement and a new round of considerable wage cuts for Northwest pilots. Thus, although the district court conceded that the union's allocation of the Northwest claim "did give an unearned benefit to any pilots who retired after the cutoff date but before the end of the eligibility period," it held that the plaintiffs failed to create "a genuine issue of material fact regarding whether [the union's] actions were arbitrary." *Bondurant*, 718 F. Supp. 2d at 844, 845. Without endorsing the union's approach as the best possible method for allocating the claim, we are also satisfied that the union tried to distribute the shares "quickly and fairly" and that its selection of the cutoff date was by no means "wholly irrational." *Id.* (internal quotations omitted).

Alternatively, the plaintiffs argue that the union acted arbitrarily because the schedule attached to Letter of Agreement 2006-03 indicates that the $888 million claim was intended to compensate pilots for wage concessions made over a 25-month period between December 1, 2004 and December 31, 2006. Thus, according to the plaintiffs, the union's decision to award claim eligibility based on an 85-month concessionary period that ran through December 31, 2011 was inconsistent with its written policy. However, the district court correctly reasoned that it was not "wholly irrational" for the union to conclude that the claim "also was meant to reimburse pilots for all of the

concessions they offered under the [Bankruptcy Restructuring Agreement], which ran through December 2011." *Id.* at 845 (internal quotations omitted).

The union's distribution scheme, moreover, did not rise to the level of discriminatory conduct that breaches the duty of fair representation. Such conduct is "'intentional, severe, and unrelated to legitimate union objectives.'" *Merritt*, 613 F.3d at 619 (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 301 (1971)). Although the participants in the Pilot Early Retirement Program clearly fared better under the union's distribution scheme than did the plaintiffs, "there is no requirement that unions treat their members identically as long as their actions are related to legitimate union objectives." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 712 (6th Cir. 2010) ("'The [u]nion was trying to make the best out of a bad situation, and it was almost inevitable that the [u]nion's drawing of a line would hurt someone. Although it is unfortunate that in this case the ultimate harm fell on appellants, drawing the line elsewhere would, or reasonably could have been thought would, have caused harm to others.'") (quoting *Ryan v. New York Newspaper Printing Pressmen's Union No. 2*, 590 F.2d, 451, 457 (2d Cir. 1979)). Unions represent diverse interests and sometimes have to make decisions that affect certain members more harshly than others. This proposition is especially true in the context of employer bankruptcy, which can present unique challenges for a bargaining representative.

In this case, after deciding on a method for allocating the $888 million Northwest claim, the union was careful to protect the interests of participants in the Pilot Early Retirement Program because it had, after all, provided special incentives to those pilots to retire early as part of Northwest's cost-saving measures. The mere fact that the plaintiffs, who were older than the early retirees, did not similarly benefit from the union's distribution scheme is insufficient to create an inference that the union intended to discriminate against them because of their age. *See id.* Moreover, the union also awarded full claim shares to a number of pilots (those who secured Second Officer positions) who were older than the plaintiffs – an aspect of the distribution scheme that considerably weakens any link between the cutoff date and discriminatory age animus.

And finally, as we discuss in the next section, the plaintiffs' additional evidence of intentional age discrimination falls decidedly short. The plaintiffs have presented no question of material fact about whether the union breached its duty of fair representation.

## V.  Statutory Age Discrimination Claims

### A.  *Overview*

The plaintiffs allege that the union's conduct violated the Age Discrimination in Employment Act, 29 U.S.C. § 623(c)(1), and the Michigan state law corollary, the Elliot-Larsen Civil Rights Act, MICH. COMP. LAWS § 37.2204(a), both of which prohibit a labor organization from "[e]xclud[ing] or expel[ling] from [] membership, or otherwise discriminat[ing] against" its members because of their age. The same analysis governs both claims. *See Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009). A plaintiff can prove an intent to discriminate using either direct or circumstantial evidence. Direct evidence of intentional discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the [defendant's] actions" whereas circumstantial evidence "allow[s] a factfinder to draw a reasonable inference that discrimination occurred." *Id.* at 620 (internal quotations omitted). With either direct or circumstantial evidence, the plaintiff bears the burden of proving "that age was the 'but-for' cause of the . . . adverse action[,]" which excludes "mixed-motive" cases from liability. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 2350, 2351 (2009) (four members of the Court disagreed and would have allowed liability in mixed-motive cases).

The Age Discrimination in Employment Act also authorizes recovery in a narrow band of disparate impact cases. *See Smith v. City of Jackson*, 544 U.S. 228, 236-38 (2005). A plaintiff who proceeds under a theory of disparate impact is not required to present evidence of a subjective intent to discriminate. Rather, a prima facie showing of disparate impact requires proof that a challenged practice, neutral on its face, had a disproportionately adverse effect on the members of a legally protected group. *See Abbott v. Fed. Forge, Inc.*, 912 F.2d 867, 872 (6th Cir. 1990); *Allen v. Sears Roebuck & Co.*, 803 F. Supp. 2d 690, 695 (E.D. Mich. 2011). Statistical evidence alone can suffice

in a disparate impact case if it is of a kind or degree sufficient to correlate a specific employment or union practice with the complained-of adverse effect. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir. 2000); *Abbott*, 912 F.2d at 872. The plaintiff, however, is responsible for "isolating and identifying the specific . . . practices that are allegedly responsible for any observed statistical disparities." *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 656 (1989); *superseded by statute on other grounds*, 42 U.S.C. § 2000e-2(k); *see Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 100 (2008). The plaintiffs in this case argue that they have furnished material proof of both intentional discrimination and disparate impact. We address each theory in turn.

## B. *Evidence of Intentional Age Discrimination*

The plaintiffs reassert on appeal that certain statements by union decisionmakers constitute proof of intentional age discrimination. *See Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009) ("Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus.") (internal quotations omitted) (alterations in original). However, even when viewing the evidence in the light most favorable to them, no intent to exclude or otherwise discriminate against the plaintiffs emerges. If anything, the statements evince the union's willingness, albeit grudging, to *grant* certain Northwest pilots (including Second Officers and participants in the Pilot Early Retirement Program) full claim shares despite the fact that many of these pilots would retire well before the Bankruptcy Restructuring Agreement's termination in December 2011. For example, Eligibility Committee Member Bill Bartels indicated that "'the really bad news is . . . that many pilots retiring soon will get full credit for the concession period. We tried to find a way around it but couldn't.'" (Br. of Pls.-Appellants 32.) Similarly, Master Executive Council Vice Chairman Ray Miller wrote an e-mail to a colleague resignedly stating that "'I didn't write the law; and it doesn't matter how either of us feel with regard to the [Age Discrimination in Employment Act] . . . We are concerned about potential (and possibly successful) litigation.'" *Id.*

Because these allegedly discriminatory remarks did not relate to the plaintiffs and actually indicate the union's recognition of the need to comply with applicable law and avoid discrimination based on age, we agree with the district court that they cannot be construed as clear, direct evidence of discrimination. *See Bondurant*, 718 F. Supp. 2d at 842. Further, contrary to the plaintiffs' assertions, the statements also fail to support an inference that the union used active employment status as a pretext to hide age animus when it created the claim eligibility rules. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 395 (6th Cir. 2008). It was reasonable for the union to provide some distinction based on the amount of time that a pilot worked during the seven-year concessionary period. The plaintiffs' age discrimination claims, insofar as they rely on evidence of the union's subjective intent to discriminate, do not present any trial-worthy questions of fact.

### C. *Age Discrimination Based On Disparate Impact*

Next, the plaintiffs invoke statistical evidence to support their age discrimination claims based on a theory of disparate impact. They indicate that out of a pool of approximately 6,000 pilots, only 176 younger pilots (who quit or otherwise left Northwest employment prior to the cutoff date) received smaller claim shares than the plaintiffs, and only 73 older pilots (presumably those who secured Second Officer positions after reaching the then-mandatory FAA retirement age of 60) received larger claim shares than the plaintiffs. (Br. of Pls.-Appellants 36.) Thus, according to the plaintiffs' interpretation, "the correlation between money received and age held true 95% of the time." *Id.* But of course, the plaintiffs' statistic fails to capture the fact that any older pilot who reached the age-60 threshold and retired after July 31, 2006 received a full claim share. So even though the cutoff date may have harmed the plaintiffs, it benefitted many more older pilots than the plaintiffs' statistic suggests.

However, even if we presume, without deciding, that the plaintiffs have put forth sufficient statistical evidence to survive summary judgment, the Age Discrimination in Employment Act explicitly states that an employer or union may avoid liability if it can show that the challenged action was "based on reasonable factors other than age." 29 U.S.C. § 623(f)(1). The "reasonable factors other than age" clause – an affirmative defense rather than an element of the discrimination claim that a plaintiff must disprove – indicates that "Congress took account of the distinctive nature of age discrimination, and the need to preserve a fair degree of leeway for employment decisions with effects that correlate with age. . . ." *Meacham*, 554 U.S. at 102; *see Allen*, 545 F.3d at 404 ("[O]nce a plaintiff has satisfied the nontrivial burden of identifying a specific employment practice, the burden of persuasion shifts to the employer to show that the practice is supported by a [reasonable factor other than age].").  Notably, the inquiry is one of reasonableness, and "[u]nlike the business necessity test [applicable to Title VII cases], which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the [reasonable factors other than age test] includes no such requirement." *City of Jackson*, 544 U.S. at 243.  The then-mandatory, FAA age-60 retirement rule is an example of such a factor.

Applying this statutory provision to the present case, the plaintiffs' age discrimination claims fail.  The union was forced to come up with some method for distributing the $888 million Northwest claim.  Its decision to create an eligibility cutoff date that was based on active employment and that coincided with the beginning of the Bankruptcy Restructuring Agreement was a reasonable, although imperfect, attempt to reconcile conflicting objectives.  Specifically, it was a mechanism that allowed the union to distribute the claim shares quickly while avoiding a "'full credit for all approach' [that] would have given a pilot active for one month the same share (worth more than $100,000) as one working 85 months." (Letter Br. of Defs.-Appellees 2.)  Thus, while it may have created effects that correlated with age, the union has met its burden of demonstrating that the distribution scheme was based on reasonable other factors. *See* 29 U.S.C. § 623(f)(1).  We understand why the plaintiffs look longingly at the pilots who reached age 60 only a few months after the cutoff date, and feel underpaid by

comparison. But we do not think that this line-drawing exercise as applied to older pilots was the result of discrimination. It was based on reasonable factors arising from limited bankruptcy funds to be distributed according to written criteria.

For the foregoing reasons, we affirm the decision of the district court.