RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0018p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

In re: COUNTRYWIDE FINANCIAL CORP.
MORTGAGE LENDING PRACTICES LITIGATION

_____

GILLIAN MILLER et al.,
                    *Plaintiffs-Appellants*,


            *v.*


COUNTRYWIDE BANK, N.A. et al.,
                    *Defendants-Appellees.*

No. 12-5250

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:08-md-1974—John G. Heyburn II, District Judge.

Argued: December 5, 2012

Decided and Filed:  January 15, 2013

Before:  MOORE, GILMAN, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Gary Klein, KLEIN, KAVANAGH & COSTELLO, LLP, Boston, Massachusetts, for Appellants.  James W. McGarry, GOODWIN PROCTER LLP, Boston, Massachusetts, for Appellees. **ON BRIEF:** Gary Klein, KLEIN, KAVANAGH & COSTELLO, LLP, Boston, Massachusetts, Wendy J. Harrison, BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C., Phoenix, Arizona, for Appellants. James W. McGarry, GOODWIN PROCTER LLP, Boston, Massachusetts, Thomas M. Hefferon, GOODWIN PROCTER LLP, Washington, D.C., for Appellees.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Eleven individuals ("the plaintiffs") who obtained home loans from Defendant-Appellee Countrywide Bank, N.A. ("Countrywide") seek class certification to challenge alleged racial disparities dating back to 2002 and resulting from Countrywide's loan-pricing policy for home mortgages. *In re Countrywide Fin. Mortg. Lending Practices Litig.*, No. 08-MD-1974, 2011 WL 4862174, at *1 (W.D. Ky. Oct. 13, 2011) [hereinafter *In re Countrywide*]. The only issue before this panel is whether the district court abused its discretion in finding that the plaintiffs' proposed class failed to satisfy Federal Rule of Civil Procedure 23(a)'s commonality requirement. We conclude that the district court did not abuse its discretion, and we **AFFIRM**.

### I. BACKGROUND AND PROCEDURE

At issue is Countrywide's loan-pricing policy, which dictated how its home loans were priced across three channels of loan origination.[1] The cost of a borrower's loan is expressed as an annual percentage rate ("APR"), which is measured in basis points, or hundredths of a percent. Countrywide established a borrower's APR through its loan-pricing policy, which has two components. The first, objective component determined an applicable "par rate" based on objective factors about the borrower and about the loan sought.[2] The plaintiffs present no complaints relating to Countrywide's objective calculation of par rates. R. 54 (Pls.' Mot. for Class Cert. at 5) (Page ID #811).

---

[1] Countrywide originated home loans through retail, wholesale, and correspondent channels. Retail loan officers originated loans directly on Countrywide's behalf. Wholesale mortgage brokers submitted borrower information for consideration; if Countrywide agreed to provide the loan, then it permitted the mortgage broker to negotiate additional fees. Third-party correspondent lenders produced loans conforming to Countrywide's underwriting guidelines, which Countrywide purchased. Bank of America acquired Countrywide's home mortgage services in July 2008.

[2] Objective factors included market interest rates, "income, property value, and loan amount," *In re Countrywide*, 2011 WL 4862174, at *1, as well as "the loan-to value ratio, the borrower's credit score, the intended use of the property, the requested date of closing, and the location of the property," Appellee Br. at 6.

The second, subjective component permitted local agents—be they loan officers, mortgage brokers, or correspondent lenders—to deviate from the par rate as follows. Loan officers and mortgage brokers could increase or decease a borrower's interest rate, and could charge borrowers with fees, provided that the total deviation fell within a specified range of the par rate. Appellee Br. at 6–9. Countrywide compensated loan officers and brokers for securing loans, and in some instances increased their compensation when a loan had a higher interest rate or additional fees.[3] As to correspondent lenders, Countrywide purchased only those loans that satisfied its underwriting requirements, and paid a premium for loans with higher interest rates or extra fees. *In re Countrywide*, 2011 WL 4862174, at *1. Plaintiffs allege that, in all channels, Countrywide's agents had broad discretion to deviate from par rate, provided that they stayed within the applicable boundaries dictating the range of acceptable deviations from par. Appellant Br. at 6–7.

The plaintiffs challenge the subjective component of Countrywide's loan-pricing policy, which they claim disparately impacts minority borrowers. *Id.* at 5. They allege that vesting local agents with discretion to deviate from objective par rates led Countrywide to charge African-American borrowers on average 11.64 basis points and Hispanic borrowers 12.50 basis points over the APR paid by their white counterparts. R. 54 (Pls.' Mot. for Class Cert. at 12) (Page ID #818). Plaintiffs seek to certify a class consisting of "[a]ll African-American and Hispanic borrowers to whom Countrywide originated a residential-secured loan, including correspondent loans, between January 1, 2002 and the present." *Id.* at 18 (Page ID #824). They seek damages, injunctive relief, and declaratory relief for alleged violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, the Fair Housing Act, 42 U.S.C. § 3601, and the Civil Rights Act, 42 U.S.C. §§ 1981–82. *Id.* at 24–25 (Page ID #830–31); Appellant Br. at 2.

---

[3]Countrywide's Full Spectrum Lending Division—a segment of Countrywide's retail channel—did not permit loan officers to charge interest rates above par. Appellee Br. at 35; R. 62-4 (Swain Dep. at 111–13) (Page ID #2166–67).

Under the Federal Rules of Civil Procedure, a plaintiff seeking to certify a class must satisfy four requirements under Rule 23(a) and at least one of several requirements under Rule 23(b). FED. R. CIV. P. 23. Our attention here is on whether the plaintiffs have established that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). The district judge found that the proposed class cannot satisfy Rule 23(a)(2)'s commonality requirement in light of *Wal-Mart Stores, Inc. v. Dukes*, — U.S. —, 131 S. Ct. 2541 (2011) (discussing FED. R. CIV. P. 23(a)(2)). The district court denied certification, for which the plaintiffs sought an interlocutory appeal pursuant to Federal Rule of Civil Procedure 23(f). We exercised our discretion to hear the appeal.

## II. STANDARD OF REVIEW

"'The district court maintains substantial discretion in determining whether to certify a class.'" *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 559 (6th Cir. 2007) (quoting *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 643 (6th Cir. 2006)), *cert. denied*, 555 U.S. 1032 (2008). A district court's decision "'will be reversed only upon a strong showing that the district court's decision was a clear abuse of discretion.'" *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012) (quoting *Beattie*, 511 F.3d at 559–60). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012).

## III. COMMONALITY CLAIM

The plaintiffs' core contention is that the district court abused its discretion by failing to distinguish their challenge to Countrywide's subjective loan-pricing policy from the failed challenge to Wal-Mart's subjective pay-and-promotion practices in *Dukes*.[4] The Supreme Court in *Dukes* faced a proposed class of 1.5 million women—all

---

[4] The plaintiffs also complain that the district court required that all class members suffer the same damages in order to satisfy commonality under Rule 23(a). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The district court's opinion is unclear on this point; the court uses the word "injury," but appears to have focused on damages. To the extent that the

current or former Wal-Mart employees—alleging systematic discrimination on matters of pay and promotion in violation of Title VII of the Civil Rights Act. Subject to boundaries on the size of salary increases and on the minimal eligibility qualifications for promotion, "pay and promotion decisions at Wal-Mart are generally committed to local managers' broad discretion, which is exercised in a largely subjective manner." *Dukes*, 131 S. Ct. at 2547 (internal quotation marks omitted).

To demonstrate "questions of law or fact common to the class," FED. R. CIV. P. 23(a)(2), a plaintiff must show that the claims in the proposed class "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551. For a suit seeking to address "millions of employment decisions at once," demonstrating a common contention means showing that "some glue hold[s] the alleged *reasons* for all those decisions together." *Id.* at 2552 (emphasis in original). A companywide policy could serve as glue if it affected all class members and caused a disparate impact. But in the context of a broad delegation of decisionmaking to the discretion of local managers, the Court observed the following:

> The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's "policy" of *allowing discretion* by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices.

*Id.* at 2554 (emphasis in original). Instead, the Court considered whether there was some other glue—"a common mode of exercising discretion that pervades the entire company"—holding these individual decisions together. *Id.* at 2554–55. Stating that "it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction," *id.* at 2555, the Court concluded that the

district court conflated damages with injury and thus expected class members to suffer the same damages, it did so in error. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 678 F.3d 409, 420 (6th Cir. 2012); *Gooch*, 672 F.3d at 428.

plaintiffs had not identified a common contention—one uniting millions of individual discretionary actions by local managers—that was suitable for classwide resolution.

The district court did not abuse its discretion in finding that *Dukes* forecloses the instant proposed class from establishing commonality.  Both cases challenge policies that grant broad discretion to local agents:  Countrywide to local agents who varied home-loan prices, and Wal-Mart to managers who made pay-and-promotion decisions.  In both cases, the exercise of discretion is cabined inside clear boundaries:  Wal-Mart managers could grant pay raises only of a certain amount and could promote only pre-qualified employees, while Countrywide agents could vary home loans only within a specified range of the predetermined par rate.  In neither case do plaintiffs allege that local actors exceeded these boundaries.  And in neither case is it asserted that, for acts of discretion taken within these boundaries, a uniform policy or practice guides *how* local actors exercise their discretion, such that the corporate guidance caused or contributed to the alleged disparate impacts.  The plaintiffs claim that "[t]he discretion Countrywide has given its sales force is exercised in a common way—by limited variation of the par rate." Appellant Br. at 7.  This statement conflates range with mode.  Both Wal-Mart and Countrywide placed clear boundaries on how far a local exercise of discretion could go, but in neither case do plaintiffs demonstrate that this range, rather than discretionary decisions made within this range, disparately impacted the proposed class.  On this point, *Dukes* is clear:  class members must unite acts of discretion under a single policy or practice, or through a single mode of exercising discretion, and the mere presence of a range within which acts of discretion take place will not suffice to establish commonality.

In seeking to distinguish *Dukes*, the plaintiffs direct us to a recent opinion involving a class that fell on the opposite side than did *Dukes* of "the line that separates a company-wide practice from an exercise of discretion by local managers." *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir.), *cert. denied*, — U.S. —, 133 S. Ct. 338 (2012).  We need not decide whether

*McReynolds* was correctly decided because, even under *McReynolds*'s approach to *Dukes*, the plaintiffs at bar would fail to satisfy commonality.

*McReynolds* involved 700 African-American brokers and former brokers of Merrill Lynch, who challenged two companywide policies. First, a "teaming policy" permitted brokers to create teams that shared clientele across members; joining a team proved financially advantageous for many brokers. Merrill Lynch left team selection largely to the discretion of local brokers. Second, an "account-distribution policy" distributed the clients of departing brokers according to criteria that made team members more likely than lone brokers to secure distributed clients. The two policies together allegedly worked a disparate impact on the earnings of African Americans, who were underrepresented on teams as compared to their white counterparts. Although both Merrill Lynch's brokers and Wal-Mart's managers held discretion that, as exercised, created a disparate impact, *McReynolds* diverged from *Dukes*, according to the Seventh Circuit, because "the exercise of that discretion is influenced by the two company-wide policies at issue . . . [that] exacerbate racial discrimination by brokers." *Id.* at 489. The Seventh Circuit determined that a common contention existed as to whether it was lawful for Merrill Lynch to adopt companywide policies that enabled individual acts of bias and then amplified their effect on minorities. *Id.* Because the policies themselves provided commonality "glue," the court did not *further* require the plaintiffs to show that teams had exercised their discretion to select members according to a common mode. *Id.* at 490 (stating that the district court overlooked "the incremental causal effect . . . of those company-wide policies.").

Essential to *McReynolds*, and missing from the instant litigation, were companywide policies that contributed to the alleged disparate impact that arose from the delegation of discretion to individual brokers. *See Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 898 (7th Cir. 2012) ("This single national policy [in *McReynolds*] was the missing ingredient in [*Dukes*].") Merrill Lynch adopted a policy that permitted teams to form and to exercise their discretion in admitting new members, and adopted a second policy that exacerbated the disparity arising from the delegation of discretion. No such

uniform policy exists here—outside of that held to be legally insufficient in *Dukes*—that contributes to the disparate pricing of home loans. Without a similar policy to provide a common contention, the plaintiffs must show that a common mode unites individual acts of discretion by Countrywide's agents, which they have not done.

Finally, the plaintiffs protest that *Dukes* does not "prevent a commonality finding in all disparate impact cases involving the exercise of discretion." Appellant Br. at 16. We agree. *See Dukes*, 131 S. Ct. at 2554 ("[W]e have recognized that, 'in appropriate cases,' giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory." (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988))). They also argue that *Dukes* does not prohibit—as they believe the district court mistakenly assumed—the use of statistical evidence to prove a disparate-impact theory. Again, we agree. The Supreme Court has relied, and the Sixth Circuit continues to rely, on statistical analysis in disparate-impact cases. *See Watson*, 487 U.S. at 987 ("The evidence in these 'disparate impact' cases usually focuses on statistical disparities, rather than specific incidents."); *Bondurant v. Air Line Pilots Ass'n, Int'l*, 679 F.3d 386, 394 (6th Cir. 2012). *Dukes* does not disturb this practice. Rather, *Dukes* reiterates that statistical correlation, no matter how robust, cannot substitute for a specific finding of class-action commonality. *Dukes*, 131 S. Ct. at 2555 ("[M]erely proving that the discretionary system has produced a racial or sexual disparity *is not enough*" where plaintiffs are unable to "'identif[y] the specific employment practice that is challenged'" (quoting *Watson*, 487 U.S. at 994 (O'Connor, J., concurring)); *see also Watson*, 487 U.S. at 994 (O'Connor, J., concurring) ("[T]he plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has *caused* the [disparate impact]") (emphasis added). As explained above, the plaintiffs have failed to establish either a uniform policy or practice, or a common mode amidst the various acts of discretion, beyond the mere act of delegating discretion, that caused the disparate impact alleged.

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order denying class certification.