RENDERED: AUGUST 4, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0559-MR

JOHN BRANDON LAMOTTE                                        APPELLANT

v.
APPEAL FROM FRANKLIN CIRCUIT COURT
HONORABLE PHILLIP J. SHEPHERD, JUDGE
ACTION NO. 17-CR-00111

COMMONWEALTH OF KENTUCKY                                    APPELLEE

AND

NO. 2020-CA-1486-MR

JOHN BRANDON LAMOTTE                                        APPELLANT

v.
APPEAL FROM FRANKLIN CIRCUIT COURT
HONORABLE PHILLIP J. SHEPHERD, JUDGE
ACTION NO. 17-CR-00111

COMMONWEALTH OF KENTUCKY                                    APPELLEE

OPINION
REVERSING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; ACREE AND MᶜNEILL, JUDGES.

ACREE, JUDGE: A jury found Brandon Lamotte guilty of first-degree assault pursuant to KRS[1] 508.010(1). Lamotte now has two appeals before this Court: No. 2019-CA-0559-MR and No. 2020-CA-1486-MR. In the first appeal, Lamotte seeks review of the denial of his motion for a directed verdict. In the second, he appeals the circuit court's denial of his CR[2] 60.02 motion. Having thoroughly reviewed the record, we agree with Lamotte that he was entitled to a directed verdict. Accordingly, we reverse and, consequently, his second appeal is moot.

## BACKGROUND

On March 3, 2017, Tamara Patrick walked out of her bathroom and found her daughter, Kate Sanders, covered in blood. Patrick immediately called 911, and the dispatcher began giving instructions to apply pressure to Sanders' wounds. However, Patrick discovered no active bleeding – the blood on her body had dried. Emergency responders arrived and found Sanders covered "head to toe"

---

[1] Kentucky Revised Statutes.

[2] Kentucky Rules of Civil Procedure.

-2-

in dried blood, but conscious and responding normally. As a precaution, they transported Sanders to the hospital to verify she suffered no internal injuries.

On the way to the hospital, her blood pressure remained steady. Still, emergency responders administered a standard intravenous saline drip. Before arriving at the hospital, Sanders' ability to respond deteriorated, and she experienced an "altered mental status." During this state, Sanders claimed the Devil stabbed her,[3] and then, apparently clarifying her first claim, alleged her abusive ex-boyfriend, Chase Dugas, attacked her. After learning Dugas had an alibi, Sanders alleged Lamotte attacked her.

Sanders testified at trial that on the morning of the attack, she invited Lamotte over to have a cigarette. The two talked and smoked. Sanders said there was nothing out of the ordinary. They did not fight, nor did they have a bad or contentious conversation. However, Sanders testified that, when they finished their cigarettes, she initiated a hug with Lamotte and, as they hugged, Lamotte stabbed her on the right side of her body. She testified Lamotte beat her and dragged her. She said she could not remember how the assault ended.

When Lamotte testified at trial, he acknowledged he and Sanders met and had a cigarette that morning. However, he denied attacking her. He said they

---

[3] Sanders suffered from bipolar disorder with a history of extreme delusions. We need not address Sanders' mental health history, other than to say its duration is lengthy.

discussed a suicide pact. After mutual assent to their pact, they parted ways to carry out their respective plans of suicide. Lamotte found a glass in his car, broke it, and cut himself attempting to bleed to death. Fortunately, Lamotte could not bring himself to make severe enough cuts to achieve suicide. At trial, Lamotte alleged Sanders' injuries came from her own efforts, just as his superficial cuts occurred as a result of his failed attempt to fulfill their suicide pact. According to Lamotte, Sanders used the ruse of an assault for fear that her suicidal ideations would lead to removal from her mother's home and re-institutionalization.

Dugas' alibi made untenable Sanders' initial accusation that he was the one who attacked her. (Record ("R.") at 270-71.) Only then did she accuse Lamotte. After trial, Sanders recanted her testimony, telling numerous people Lamotte did not attack her.[4]

Sanders' post-trial recantation is pertinent to a review of Lamotte's CR 60.02 motion. Because we are reversing the circuit court's denial of Lamotte's directed verdict motion, his appeal of the circuit court's order denying his CR 60.02 motion is moot and we need not further consider that post-trial evidence.

---

[4] In April 2019, Sanders admitted to several individuals, and posted statements on social media, that Lamotte did not attack her. In August 2019, when considering this evidence post-trial, the circuit court attributed Sanders' recantation to her then-current state of mind, brought on by mental health issues, drug use, and homelessness.

Our examination of the Commonwealth's evidence at trial begins with testimony of an emergency responder who said Sanders had two injuries: a laceration on her right jawline and a laceration on her right side near her hip. The record contains no evidence of the depth of Sanders' wounds despite the availability of her medical records. No sutures appear to have been necessary to close any wound. There is a lack of evidence that any stab wound or laceration to Sanders' chest resulted in a collapsed lung. However, medical records indicate Sanders had chronic pneumothorax, a collapsed lung not caused by a traumatic event. (R. at 114-17.) Despite not actively bleeding, doctors took Sanders "emergently to the operating room." (R. at 117.) The record, including the medical records, contains no specifics regarding why she went to the operating room or if there was a connection between her wounds and any other medical condition that might have necessitated a procedure in the operating room.

At the close of evidence, Lamotte moved for a directed verdict, but his motion was denied. The jury then found Lamotte guilty of first-degree assault under KRS 508.010(1). As noted, Lamotte filed a CR 60.02 motion for a new trial predicated on Sanders' recantation and alleged *Brady*[5] violations. Lamotte now appeals the denial of the directed verdict and the denial of the CR 60.02 motion.

---

[5] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Our focus is on Lamotte's argument that the Commonwealth failed to prove each element of first-degree assault under KRS 508.010(1). Specifically, he claims the Commonwealth failed to introduce sufficient evidence that Sanders suffered a serious physical injury as defined by KRS 500.080(15).[6] We agree with Lamotte that a finding of serious physical injury is clearly unreasonable given the evidence in this record.

## STANDARD OF REVIEW

When considering a criminal defendant's motion for a directed verdict:

> the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

> The standard for appellate review is equally clear: "[o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal."

---

[6] Since Lamotte's trial, the General Assembly amended KRS 500.080, including subsection (15), renumbering it as KRS 500.080(18). However, the substantive definition applicable to Lamotte and Sanders has not changed.

-6-

*Eversole v. Commonwealth*, 600 S.W.3d 209, 218 (Ky. 2020) (quoting *Benham*, 816 S.W.2d at 187).

For our purposes, it is irrelevant whether Lamotte properly preserved this issue for appeal as the United States Constitution "mandates the government must prove every element of the charged offense beyond a reasonable doubt." *Anderson v. Commonwealth*, 352 S.W.3d 577, 581 (Ky. 2011) (citing *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002); KRS 500.070(1)). "Failure to do so violate[s] the accused's right to Due Process." *Anderson*, 352 S.W.3d at 581 (citation omitted).

## ANALYSIS

Pursuant to KRS 508.010(1), for a jury to find a defendant guilty of first-degree assault, the Commonwealth must prove beyond a reasonable doubt that:

> (a) [The defendant] intentionally cause[d] *serious physical injury* to another person by means of a deadly weapon or a dangerous instrument; or
>
> (b) Under circumstances manifesting extreme indifference to the value of human life [the defendant] wantonly engage[d] in conduct which create[d] a grave risk of death to another and thereby cause[d] *serious physical injury* to another person.

KRS 508.010(1) (emphasis added). A first-degree assault conviction under KRS 508.010(1)(a) or (1)(b) requires proof of a "serious physical injury."

-7-

Under KRS 500.080(15), the term "serious physical injury" is defined as a "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ." KRS 500.080(15).[7] This Court previously interpreted KRS 500.080(15) as "set[ting] a fairly strict level of proof which must be met by sufficient evidence of injury, medical and/or non-medical, taken as a whole, before an instruction on first-degree assault may be given." *Prince v. Commonwealth*, 576 S.W.2d 244, 246 (Ky. App. 1978) (emphasis omitted). Despite this strict standard, KRS 500.080 does not require medical expert testimony to prove a serious physical injury to satisfy the evidentiary requirements of KRS 508.010(1). *Brooks v. Commonwealth*, 114 S.W.3d 818 (Ky. 2003); *see also Prince*, 576 S.W.2d at 246.

"When determining whether a defendant caused a 'serious physical injury,' the issue is not whether there was proof of an act that *could* cause 'serious physical injury.' The issue is whether there was proof of an act that *did*, in fact, cause 'serious physical injury.'" *Anderson*, 352 S.W.3d at 581 (emphasis original) (citing *Commonwealth v. Hocker*, 865 S.W.2d 323 (Ky. 1993) (Leibson, J., dissenting)). This standard requires courts to engage in a case-by-case analysis to

---

[7] The Commonwealth alleged Sanders suffered prolonged impairment of health and prolonged loss or impairment of the function of a bodily organ. However, as discussed, the record does not reflect that the Commonwealth presented direct evidence of either.

determine if a substantial risk of death exists based on "the totality of the evidence" in each case. *Cooper v. Commonwealth*, 569 S.W.2d 668, 671 (Ky. 1978).

In *Anderson*, the defendant was in a fight and cut his victim's face with a straight razor. *Anderson*, 352 S.W.3d at 580. The cut ran across the victim's jawline and was about one inch deep, to the jawbone. *Id.* The victim testified that "[t]hey said if my jawbone didn't stop [the razor], that I wouldn't be here today." *Id.* A nurse, who was only "peripherally involved" in the victim's case stated the victim's injuries were "serious." *Id.* Nevertheless, the cut did not lacerate the carotid artery, and the victim was discharged the same day after an intravenous saline solution was administered for an elevated heart rate. *Id.*

In reviewing this evidence, the Kentucky Supreme Court wrote "[n]otably, no medical records from the emergency room admission were introduced at trial and there was no proof [the victim] received any additional medical treatment for the injury." *Id.* The jury found the defendant guilty of first-degree assault pursuant to KRS 508.010(1). *Id.*

The Kentucky Supreme Court held the Commonwealth failed to introduce evidence sufficient to prove the victim faced a substantial risk of death defined under KRS 500.080(15) to prove a serious physical injury. *Id.* at 581-82. This is because, while "[s]lashing at someone's face and neck area with a straight

razor certainly could cause 'serious physical injury[,]' . . . the question is not what could have happened, but rather what did happen." *Id.* at 583 (emphasis omitted). Based on the evidence presented, the Kentucky Supreme Court determined similar cases required "a more exacting level of proof" to show a serious physical injury occurred for purposes of KRS 508.010(1). *Id.* at 582. We have examples to contrast with *Anderson* and the instant case.

In *Brooks v. Commonwealth*, the Kentucky Supreme Court found a serious physical injury occurred where the defendant slashed the victim across his neck, stabbed the victim in the face and neck, and the victim received numerous defensive wounds from the attack – eventually being found in a pool of blood. *Brooks*, 114 S.W.3d at 824. In *Commonwealth v. Hocker*, the Kentucky Supreme Court found a serious physical injury where the victim was gruesomely beaten with baseball bats and suffered a skull fracture, hemorrhaging, and blood clots. *Hocker*, 865 S.W.2d at 324. In both cases, the Court concluded there was a "substantial risk of death," as required by KRS 500.080(15), that was neither theoretical nor abstract, but concrete.

In the context of this jurisprudence, Sanders' injuries do not constitute serious physical injury. The proof of Sanders' injuries is not different in kind from those of the *Anderson* victim. By comparison, they were less serious.

Sanders' attacker cut her along her jawline, like the victim in *Anderson*, who was also cut along the jawline. However, unlike Sanders, the victim's injury in *Anderson* was an inch deep and still bleeding when he arrived at the hospital. Here, Sanders' cuts were no longer bleeding, and there is no evidence regarding the depth of the laceration but, like the *Anderson* victim, the carotid artery was not impacted. The record does show Sanders' blood pressure remained stable during her ride to the hospital, and we also know Sanders' laceration did not require stitches, unlike the victim's cut in *Anderson* which did.

Unlike the victim in *Brooks*, found by emergency responders in a pool of his own blood, Sanders' medical responders merely found her covered in dried blood. Sanders was not actively bleeding as was the victim in *Brooks*. Unlike the victim in *Hocker* who was nearly beaten to death and suffered a skull fracture – an obvious traumatic head injury – Sanders actively responded to emergency responders when they arrived. In both *Brooks* and *Hocker*, the Kentucky Supreme Court found a serious physical injury. Based on the record and construing the record in the light most favorable to the Commonwealth, the evidence of Sanders' injuries is not as strong as either of these cases where proof satisfied the "serious physical injury" element. Nor does Lamotte's case contrast favorably to the Commonwealth with *Anderson* where the proof did not support a finding by

-11-

reasonable jurors of a serious physical injury. Based on our analysis, neither did the proof in Lamotte's case.

Unlike *Anderson*, where no medical records were admitted, the Commonwealth here introduced a substantial number of Sanders' medical records. We have closely examined that evidence and considered the testimony relating to it. We have also examined the Commonwealth's citations to the record it claimed identified medical proof that Sanders' attacker inflicted a serious physical injury risking death different from that described in *Anderson*. We remain unpersuaded.

The Commonwealth's citations to the record for support that Sanders "suffered a substantial risk of death" appear on page 12 of its brief; specifically, the citations are to Volume II, pages 266, 268, and 271 of the certified record. But these citations are not to medical records. Rather, they are three separate pages of the transcript of the police interrogation of Chase Dugas. Our examination of the record revealed medical records to which the Commonwealth might have intended to direct us. However, those medical records reveal only evidence of the superficiality of Sanders' wounds and the coincidental treatment two days later for Sanders' chronic, pre-existing pneumothoracic condition.

As we explain, even with the medical records here, and construing everything in the medical record favorably for the Commonwealth, we fail to see proof of injuries creating a substantial risk of death.

In *Anderson*, a nurse described the victim's injury as "serious," but in the totality of the circumstances, the Kentucky Supreme Court ruled that the injury did not constitute a serious physical injury. *Anderson*, 352 S.W.3d at 580, 584. In this case, a paramedic said the two wounds were severe but did not characterize them as "serious" or testify they posed any risk of death.

The Commonwealth argues *Brown v. Commonwealth* stands for the proposition that any evidence of any type of pneumothorax satisfies the serious physical injury requirement of KRS 508.010(1). 553 S.W.3d 826, 831 (Ky. 2018). Our reading of *Brown* does not support such a bright-line rule. In *Brown*, the defendant's stabbing of his victim three times in her chest punctured her lung, thereby causing the acute pneumothorax she experienced – a collapsed lung attributable to a traumatic event. *Id.* The Kentucky Supreme Court held it would not be unreasonable to find a serious physical injury where, "[a]s a *result of the stabbing*," the victim "suffered a punctured lung, creating a hole in the lung and *causing a pneumothorax . . . .*" *Id.* In this case, the Commonwealth presented no evidence that the pneumothorax Sanders experienced was caused by the attack. In fact, the record indicates the contrary.

Medical records filed under seal show Sanders received emergency treatment for a puncture wound of the left front wall of Sanders' thorax (*i.e.*, her upper torso), but, unlike the assault in *Brown*, the victim's wound in this case was

-13-

superficial *without penetration of the thoracic cavity* containing the lungs.[8]  Other records show Sanders' pneumothorax, or collapsed lung, was a chronic condition rather than an acute one caused by a traumatic event.  On March 5, 2017, two days after her attack, nurses prepped Sanders for the insertion of a chest tube, (R. 110), and, by noon, physicians had successfully treated her "Chronic Pneumothorax." (R. 114).

Because the Commonwealth presented no evidence to support the claim of acute pneumothorax caused by the attack and nothing but evidence of her treatment for chronic pneumothorax contradicting this theory, we do not find *Brown* very helpful on this point.  Instead, we find *Commodore v. Commonwealth* to be more persuasive in determining whether the circuit court erred in denying Lamotte's motion for a directed verdict.

In *Commodore*, an unpublished Kentucky Supreme Court opinion,[9] Commodore attempted to rob a neighborhood shop that sold cigarettes, produce, and flowers.  *Commodore v. Commonwealth*, No. 2018-SC-000617-MR, 2020 WL 2831437, at *1 (Ky. May 28, 2020).  Commodore failed to rob the store, and as he

___

[8] More specifically, the medical record states "PNCTR W/O FB OF L FRNT WL OF THORAX W/O PENET THOR CAV" or "puncture without foreign body of left front wall of thorax without penetration of thoracic cavity."  (Sealed record, filed 2/28/2020.)

[9] We cite this unpublished opinion in accordance with Kentucky Rules of Appellate Procedure RAP 41(A), not as precedent, but because it is the persuasive and thoughtful opinion of the highest court of the Commonwealth on this point of law.

fled, he stabbed Smith, the owner of the shop, in the neck. *Id.* When emergency responders arrived, they found Smith sitting in a chair applying pressure to his neck. *Id.* Emergency responders testified Smith had controlled the bleeding, but they took Smith to the hospital for treatment because any potential internal injuries could not be seen at the scene. *Id.* At the hospital, Smith no longer actively bled, and the doctors determined Smith suffered a superficial stab wound only 2 cm deep. *Id.* at *2. Medical records described Smith's injuries:

> 75 yo gentlemen s/p stab to L neck while being robbed. Pt denies any hoarseness, trouble swallowing & doesn't have an expanding hematoma. [N]o active bleeding from wound. [O]nly real medical problem is diabetes, not on a blood thinner. [N]o other problems or stab wounds.

*Id.* (alterations in original). The Kentucky Supreme Court held the circuit court erred in denying Commodore's directed verdict motion because the Commonwealth failed to prove Smith suffered from a serious physical injury resulting from the assault as required by KRS 508.010(1). The Kentucky Supreme Court relied on *Anderson* to reason that the injuries in *Commodore* did not present Smith with a substantial risk of death, although, theoretically, an injury to the neck could result in such an injury. *Id.* at *4.

Our reading of *Commodore* aligns with and supports our conclusion when read together with the published Kentucky Supreme Court cases analyzed above. Sanders' suffered injuries like those suffered by Smith. Both were stabbed

-15-

in and suffered lacerations to the neck. Both wounds were shallow enough to stop bleeding by the time emergency responders arrived. Both were taken to the hospital as a precautionary measure. The Commonwealth, in the case *sub judice*, did not present any evidence of Sanders facing a substantial risk of death from wounds that stopped bleeding before emergency responders arrived.

Even when reading all the evidence in a light most favorable to the Commonwealth, the injuries Sanders suffered do not satisfy the definition of serious physical injury. The Commonwealth did not overcome the stringent burden established by the case law to show a serious physical injury for purposes of KRS 508.010(1).

With due respect, we are not persuaded by the dissent because, when the *totality* of the evidence is considered, we do not believe reasonable minds could differ with the conclusion that Sanders did not suffer a serious physical injury.

The Commonwealth presented evidence of external injuries and pneumothorax but failed to present any evidence that the first caused the second. Instead, it relied on the logical fallacy of *post hoc, ergo propter hoc* – that because effect A happened after alleged cause B, B caused A. Such logic is never enough to establish causation. *See, e.g., Abbott v. Federal Forge, Inc.*, 912 F.2d 867, 875 (6th Cir. 1990) ("[P]*ost hoc, ergo propter hoc* is not a rule of legal causation.").

If consideration of the evidence is limited to what the Commonwealth cherry-picked for special attention – an assault followed by a collapsed lung – the unreasonableness of an inference of causation does not appear so obvious. However, when applying the standard of *Commonwealth v. Benham*, we are obligated to presume the circuit court is familiar with and considers all the evidence. *Simmons v. Commonwealth*, 576 S.W.2d 253, 254-55 (Ky. App. 1978) (when considering a directed verdict motion "the trial judge has been given an opportunity to pass on the sufficiency of all of the evidence . . . ."). The fallacy of *post hoc, ergo propter hoc* logic is revealed by medical proof in this case that the victim's thoracic cavity containing her lungs was never penetrated, that the lung did not collapse until two days later, and that the victim had a history of chronic pneumothorax. Given all the evidence, it was clearly unreasonable for the jury to have found the victim suffered serious physical injury as the statute and our case law defines it.

Lamotte could not be found guilty of first-degree assault pursuant to KRS 508.010(1) by reasonable jurors because the Commonwealth failed to prove each element of first-degree assault. It was error not to grant directed verdict for the defendant with regard to that charge.

# CONCLUSION

Our analysis of Lamotte's direct appeal makes unnecessary a review of the circuit court's denial of Lamotte's CR 60.02 motion. For the foregoing reasons, however, we reverse the Franklin Circuit Court's April 3, 2019 Judgment and Sentence following a jury trial.

THOMPSON, CHIEF JUDGE, CONCURS.

MCNEILL, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

MCNEILL, JUDGE DISSENTING: In consideration of the majority's well-written Opinion, I must respectfully dissent.

Foundational to the disposition of the present matter is our standard of review – one of the strictest standards in law:

> [o]n appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be **clearly unreasonable** for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (emphasis added) (citation omitted). While often cited, our standard here is less often internalized for what it means if applied in the affirmative; that is, to take away a fact issue from a jury. In this case, a jury who found guilt. And while I fully submit that reasonable minds may differ here, I cannot say, based on the record presented and

meticulously summarized by the majority, that it would be **clearly unreasonable** for a jury to find Lamotte guilty of first-degree assault.

I also emphasize that we must "draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Benham*, 816 S.W.2d at 187. This includes the entirety of the evidence. Most juries are not comprised of physicians, and they need not be. They are, however, astute observers of nuance and totality. On balance, I would defer to their judgment. Indeed, "[p]recisely because the facts of this case present a close call, we must not take the decision from the jury . . . ." *See Commodore v. Commonwealth*, No. 2018-SC-00617-MR, 2020 WL 2831437, at *13 (Keller, J., concurring in part and dissenting in part). Therefore, I respectfully dissent.

BRIEF FOR APPELLANT:

Amy Robinson Staples
Shelbyville, Kentucky

Whitney Wallace
Frankfort, Kentucky

Roy Durham
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

M. Brandon Roberts
Assistant Attorney General
Frankfort, Kentucky